**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| GRANT CARPENTER, as Special Administrator of the Estate of NIELSEN CONNER, deceased,<br>Plaintiff,<br>v.<br>TURN KEY HEALTH CLINICS, LLC, et al.,<br>Defendants. | ) | Case No. CIV-25-763-SLP |

**O R D E R**

Before the Court is Defendants Desiree Garza and Lori Meraz's respective Motions to Dismiss [Doc. Nos. 24, 25]. The matter is fully briefed. *See* Pl.'s Resp. [Doc. Nos. 28, 29]; Def.'s Reply [Doc. No. 30, 31]. For the reasons that follow, Defendants Desiree Garza and Lori Meraz's Motions are DENIED.

## I. Introduction

In July 2023, Nielsen Conner passed away while detained at the Canadian County Jail. Plaintiff, Grant Carpenter, brings this action pursuant to 42 U.S.C. § 1983, as Special Administrator of the Estate of Nielsen Conner. Plaintiff brings claims against Defendants Garza and Meraz (collectively, "Defendants") for their delay and/or denial of medical care to Mr. Conner, which eventually resulted in his death. Defendant Garza moves to dismiss Plaintiff's claims against her on grounds that her conduct, at most, rises to the level of negligent conduct which is not actionable under § 1983. Defendant Meraz moves to dismiss Plaintiff's claims against her because her conduct amounted to a difference in

opinion as to the proper medical care to be provided to Mr. Conner, which is also not actionable under § 1983.

Mr. Conner was booked into the Canadian County Jail on or around July 19, 2023. His medical intake screening only took place on the morning of July 21, 2023. One of the individuals responsible for his intake was Defendant Meraz. During this intake, Defendant Meraz, a licensed professional nurse (LPN), was informed that Mr. Conner had been addicted to opiates. Mr. Conner stated that he had taken opiates just three days earlier and that he used four to five grams of fentanyl daily, over the past two to three years. Mr. Conner also reported that he was suffering from severe symptoms of withdrawal from his opiates use. Some of the symptoms reported included lethargy, constant nausea, frequent dry heaves/vomiting, diarrhea, and the inability to eat. Defendant Meraz also noted that Mr. Conner displayed pilorection of his skin, which is a common symptom of opioid withdrawal. Defendant Meraz, aware of Mr. Conner's previous opiate use and these symptoms, placed him into the general prison population and put him on a continuity of care plan of withdrawal/detox monitoring (the "Withdrawal Assessment").

The purpose of the Withdrawal Assessment is for medical personnel to regularly monitor certain inmates, like Mr. Conner, several times a day. During monitoring, personnel take vital signs, provide treatment, and report emergent symptoms or worsening of a condition to more highly trained professionals. On July 21, 2023, at 6:12 p.m., Defendant Meraz marked the evening shift Withdrawal Assessment as complete but left no record that Mr. Conner was monitored pursuant to the Withdrawal Assessment.

Over twenty hours later, on July 22, 2023, at or around 2:28 p.m., Defendant Garza conducted a follow-up evaluation with Mr. Conner. Defendant Garza, an LPN, noted that Mr. Conner was now suffering from tremors in addition to his other previously reported symptoms. Mr. Conner was also visibly sweating and lethargic. Nearly five hours after this evaluation, at 7:21 p.m., Defendant Garza marked Mr. Conner's follow-up evaluation as complete. She did not record anything related to the Withdrawal Assessment.

On Sunday, July 23, 2026, at or around 12:35 p.m., Defendant Garza was notified that Mr. Conner was unable to ambulate for a detox assessment. On arriving at his cell, Defendant Garza found Mr. Conner lying down on a bottom bunk. She noted that Mr. Conner's condition was very lethargic, malnutritioned and poor. Defendant Garza also noticed bile in the corner of Mr. Conner's cell; she learned that he had been throwing up for days and that he was unable to keep anything down. At this point, Defendant Garza took Mr. Conner's vitals, which indicated a blood pressure of 82/50 mmHg and a heart rate of 126 bpm; this indicated that Mr. Conner was suffering from a combination of hypotension and tachycardia. Defendant Garza informed Advanced Practice Registered Nurse (APRN) Pata, an offsite medical staff member, of Mr. Conner's vitals. Pata recommended that Mr. Conner be taken to the Emergency Room (ER).

When Emergency Medical Services (EMS) arrived, Mr. Conner was completely limp, his skin cold to the touch. He was not breathing and no pulse could be felt of heard. On July 23, 2023, at 2:18 p.m., Mr. Conner was declared dead while at the ER.

## II. Governing Standard

A party may move to dismiss a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal is proper when the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." B*ell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1207 (10th Cir. 2022) (citation omitted).

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the [complaint] alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted). In reviewing the sufficiency of the complaint, "[a]ll well-pled factual allegations are accepted as true and viewed in the light most favorable to the nonmoving party." *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010). However, not all factual allegations are entitled to the assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). A formulaic recitation of the elements of a claim and other conclusory allegations need not be accepted as true. *Id.* at 681 (citing *Twombly*, 550 U.S. at 554-55).

## III. Legal Framework

"The right to custodial medical care is well settled." *Estate of Beauford v. Mesa Cnty., Colo.*, 35 F.4th 1248, 1262 (10th Cir. 2022) (citing *Estelle v. Gamble*, 429 U.S. 97

(1976)).[1] A prisoner's constitutional rights are violated when prison officials act with deliberate indifference to an inmate's serious medical needs. *Id*. Deliberate indifference entails both an objective component and a subjective component. *Id*.

Defendants challenge only the subjective component in seeking dismissal. *See* Def. Garza's Mot., [Doc. No. 24] at 7 ("[D]eath is sufficiently serious to satisfy the objective component needed to establish deliberate indifference."); Def. Meraz's Mot., [Doc. No. 25] at 6 (same). The subjective component requires a plaintiff to establish that "a prison official had a sufficiently culpable state of mind." *Est of Beauford*, 35 F.4th at 1262 (internal quotation marks and citation omitted). The official must have acted with "deliberate indifference," which means "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have] be[en] aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must [have] also draw[n] the inference." *Id*. at 1263. A substantial risk of serious harm may be shown by "inference from circumstantial evidence" or "the very fact that the risk was obvious." *Id*. (internal quotations and citation omitted).

"[T]he subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ('failure to properly treat theory') or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ('gatekeeper theory')." *Lucas v. Turn Key*

[1] A pretrial detainee's right to medical care is governed by the Fourteenth Amendment's Due Process Clause, but the same standard is applied as that used to analyze Eighth Amendment claims brought by convicted prisoners. *Id*.

*Health Clinics, LLC*, 58 F.4th 1127, 1137 (10th Cir. 2023). "[D]oing nothing in the face of serious medical needs is obviously sufficient to state a claim under both theories." *Id*. at 1139.

"[I]n the gatekeeping context, where some medical care is present, [the Tenth Circuit] has still evaluated it for sufficiency and whether it is the functional equivalent to a complete denial of care. *Id*. at 1138 (citing *Burke v. Regalado*, 935 F.3d 960, 992–93 (10th Cir. 2019)). Further, "providing some care does not insulate a medical professional from liability when the professional delays referral to a specialist." *Id.* (citing *Oxendine v. Kaplan*, 241 F.3d 1272, 1279 (10th Cir. 2001)). Even a brief delay in treatment can be unconstitutional. *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005).

## III. <u>Discussion</u>

On the morning of July 21, 2023, Defendant Meraz was aware that Mr. Conner was withdrawing from opiates. At his medical intake screening, Mr. Conner informed Defendant Meraz that he had recently taken opiates, just three days prior to the medical assessment. She was also aware that Mr. Conner had used fentanyl regularly over the past two to three years. In addition to the symptoms reported to her, Defendant Meraz also observed that Mr. Conner displayed pilorection of his skin, which is a common symptom of opioid withdrawal. After this intake assessment, Defendant Meraz placed Mr. Conner on the Withdrawal Assessment for further monitoring. During monitoring, personnel take vital signs, provide treatment, and report emergent symptoms or worsening of a condition to more highly trained professionals. Taking all reasonable inferences in favor of Plaintiff,

Defendant Meraz failed to adequately monitor Mr. Conner pursuant to the assessment.[2] On the evening of July 21, 2023, Defendant Meraz marked the evening shift Withdrawal Assessment as complete but left *nothing* in Mr. Conner's record indicating that he was adequately monitored. *Cf. Mata*, 427 F.3d at 759 (finding that a prison official "fulfilled her gatekeeper duty by reporting [Plaintiff's] symptoms. . .in accordance with the [applicable] protocol for chest pain."). Indeed, there are no allegations that Defendant Meraz did anything before marking Mr. Conner's Withdrawal Assessment as complete. By placing Mr. Conner on the Withdrawal Assessment, Defendant Meraz knew that Mr. Conner required "additional medical care and referral", but she failed to adequately treat or fulfill her gatekeeper role. *See Lucas*, 58 F.4th at 1138; *id.* at 1139 ("[U]nder the subjective component of the deliberate indifference analysis, a licensed medical professional's heightened knowledge and training can be highly relevant and may tend to show awareness of and disregard of a substantial risk."). The Court therefore finds that Defendant Meraz failed to properly treat Mr. Conner and refused to fulfill her gatekeeping role.

Defendant Garza similarly failed to properly treat Mr. Conner by delaying (or refusing) to fulfill her gatekeeper role. After Defendant Garza conducted a follow-up

---

[2] Defendant Meraz argues that Plaintiff does not allege that Defendant Meraz failed to follow the Withdrawal Assessment. *See* Def. Meraz's Reply, [Doc. No. 31] at 3. The Court disagrees. Plaintiff adequately alleges as follows: "On July 21, 2023 at 6:12 p.m., Nurse Meraz marked the evening shift detox/withdrawal monitoring assessment as complete. However, no vitals were taken, no interview was conducted, no symptoms were cataloged, and no record of any interaction between Mr. Conner and any medical staff exists for any time near when this appointment was marked as completed. Upon information and belief, neither Nurse Meraz nor any other medical provider actually conducted a medical assessment of Mr. Conner." Am. Compl., [Doc. No. 22] at 6, ¶ 23.

evaluation with Mr. Conner on July 22, 2023, at 2:28 p.m., she was aware that Mr. Conner exhibited various new symptoms in addition to those noted during Mr. Conner's medical intake screening. Specifically, she noted that Mr. Conner was now suffering from tremors and was also visibly sweating and lethargic. However, nearly five hours later, at 7:21 p.m., she merely marked Mr. Conner's follow-up evaluation as complete. Defendant Garza did not record anything related to Mr. Conner's withdrawal assessment.[3] The Court thus finds that Defendant Garza failed to exercise any medical judgment when evaluating Mr. Conner. She further failed to refer Mr. Conner to another medical provider, on July 22, 2023, despite his worsening withdrawal symptoms. Defendant Garza only escalated Mr. Conner's medical condition to an offsite APRN on July 23, 2026, over twenty-two hours after her follow-up evaluation of Mr. Conner, when Mr. Conner was unable to ambulate for a detox assessment. *See Lucas*, 58 F.4th at 1138 ("The patient's medical issue obviously required

---

[3] Defendant Garza states that Plaintiff's allegation that she "failed to comply with the detox/withdrawal protocol has no accompanying facts and appears to be entirely conclusory in nature." Def. Garza's Reply, [Doc. No. 30] at 3. Taking all reasonable inferences in favor of Plaintiff, the Court disagrees. Plaintiff pleads what the purpose of a withdrawal/detox continuity of care plan is. Plaintiff also pleads that pursuant to such a plan, medical personnel are to "report emergent symptoms and/or worsening of the condition to more highly trained medical professionals." *See* Am. Compl., [Doc. No. 22], at 6, ¶ 21. Defendant Garza's "follow-up evaluation" of Mr. Conner was conducted a day after Mr. Conner's placement on the Withdrawal Assessment. At a minimum, Defendant Garza was aware that Mr. Conner was withdrawing from opiates, that he was exhibiting previously reported and new symptoms of withdrawal, and that he had been placed on the Withdrawal Assessment. Based on these allegations, the Court finds that Plaintiff has plausibly plead that Defendant Garza failed to comply with the Withdrawal Assessment's monitoring protocol. As such, whether Defendant Garza's "follow-up evaluation" was pursuant to the Withdrawal Assessment, or not, does not change the fact that Defendant Garza failed to fulfill her gatekeeping requirement under Tenth Circuit law. *See Lucas,* 58 F.4th at 1138 ("The inquiry under a gatekeeper theory is not whether the prison official provided *some* care but rather whether they fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises.").

'additional medical care and referral' and because the [provider] delayed addressing that need, he did not commit mere malpractice but rather consciously disregarded substantial risk to the inmate."); *Mata*, 427 F.3d at 755 ("Even a brief delay in treatment can be unconstitutional."). The Court therefore finds that Defendant Garza failed to properly treat Mr. Conner and refused to fulfill her gatekeeping role.

## IV. Conclusion

Upon review of Plaintiff's allegations, the Court concludes that he has plausibly alleged facts to show that Defendants Meraz and Garza's conduct satisfies the subjective component of a claim of deliberate indifference to medical needs. The allegations demonstrate conduct evincing deliberate indifference, not mere negligent conduct amounting to a difference in opinion as to the proper medical care to be provided to Mr. Conner. Accordingly, Defendants Desiree Garza and Lori Meraz's respective Motions to Dismiss, [Doc. Nos. 24, 25], are DENIED.

IT IS SO ORDERED this 30th day of September, 2026.

**SCOTT L. PALK**
**CHIEF UNITED STATES DISTRICT JUDGE**